ALDEN F. ABBOTT
General Counsel

DELILAH VINZON, CA Bar No. 222681
JOHN D. JACOBS, CA Bar No. 134154
MARICELA SEGURA, CA Bar No. 225999
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
dvinzon@ftc.gov, jjacobs@ftc.gov,
msegura@ftc.gov
Tel: (310) 824-4300; Fax: (310) 824-4380

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

STUDENT ADVOCATES TEAM, LLC, a
limited liability company;

PROGRESS ADVOCATES GROUP,
LLC, a limited liability company, also dba
Student Advocates;

STUDENT ADVOCATES GROUP, LLC,
a limited liability company;

ASSURANCE SOLUTION SERVICES,
LLC, a limited liability company;

BRADLEY JASON HUNT, an individual;

SEAN QUINCY LUCERO, an individual;

Case No.:   8:19-cv-1728

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

- 1 -
COMPLAINT

and                                          )
                                             )
EQUITABLE ACCEPTANCE                         )
CORPORATION, a corporation,                  )
                                             )
                        Defendants.          )
_____     )

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-1666j, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; or TILA, and its implementing Regulation Z, 12 C.F.R. Part 1026, in connection with marketing, promotion, offering for sale, sale, and extension of credit for the purchase of student loan debt relief services.

## SUMMARY OF THE CASE

2. Plaintiff alleges violations of various consumer protection statutes in connection with the sale of student loan debt relief services and the financing of the fees that were charged for those services. As set forth in Counts I-VI below, this Complaint alleges law violations on the part of the sellers of these services—Student Advocates Team, LLC ("SAT"), Progress Advocates Group, LLC dba Student Advocates ("PAG"), Student Advocates Group ("SAG"), and Assurance Solutions Services, LLC ("ASSL") (referred to collectively herein as the "Corporate Debt Relief Defendants")—and their owners—Bradley J. Hunt ("Hunt") and Sean Q.

Lucero ("Lucero") (collectively with Corporate Debt Relief Defendants, referred to herein as "Debt Relief Defendants"), as well as violations on the part of the company that extended credit to pay for the Corporate Debt Relief Defendants' fees, Equitable Acceptance Corporation ("EAC").

3.     The alleged violations by the Debt Relief Defendants, as described in more detail below, include:

     a.  violating the FTC Act and the TSR by making deceptive representations regarding Corporate Debt Relief Defendants' services and the payment that consumers were, or were not, required to make; and

     b.  violating the TSR by requesting or receiving payment in advance of fully performing the debt relief service.

4.     The alleged violations by EAC include:

     a.  violating the TSR by assisting and facilitating Debt Relief Defendants in their violations of the TSR, while knowing or consciously avoiding knowing that Debt Relief Defendants were engaged in such violations; and

     b.  violating TILA and Regulation Z by failing to clearly and conspicuously make written disclosures that are required by TILA and Regulation Z.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.  The FTC also enforces TILA, 15 U.S.C. § 1601 *et seq*., and its implementing Regulation Z, 12 C.F.R. Part 1026, which establishes, *inter alia*, disclosure and calculation requirements for consumer credit transactions and advertisements.

8.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, and TILA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, 6102(c), and 1607(c).

## DEFENDANTS

### *The Corporate Debt Relief Defendants*

9.     Student Advocates Team, LLC ("SAT") is a Delaware limited liability company.  It has operated out of 3100 Bristol Parkway, Suite 300, Costa Mesa, CA 92626 and currently has its principal place of business at 95 Enterprise, Aliso Viejo, CA 92656.  SAT transacts or has transacted business in this District and throughout the United States.  At times material to this Complaint, acting alone or in concert with others, SAT has marketed, promoted, offered for sale, sold, financed, or extended credit for, the purchase of student debt relief products or services to consumers throughout the United States.  SAT is a successor in interest to each of the Corporate Debt Relief Defendants; it had common ownership, managers, employees, business functions, and office location as the Corporate Debt Relief Defendants and continues to handle each entities' customer accounts.

10.     Progress Advocates Group, LLC ("PAG") is a Delaware limited liability company, also doing business as Student Advocates.  It has operated out of 3100

Bristol Parkway, Suite 300, Costa Mesa, CA 92626; 615 N. Nash Street, Suite 202A, El Segundo, CA 90245; and currently has its principal place of business at 95 Enterprise, Aliso Viejo, CA 92656. PAG transacts or has transacted business in this District and throughout the United States. At times material to this Complaint, acting alone or in concert with others, PAG has marketed, promoted, offered for sale, sold, financed, or extended credit for, the purchase of student debt relief products or services to consumers throughout the United States.

11. Student Advocates Group, LLC ("SAG") is a Delaware limited liability company. It has operated out of 3100 Bristol Parkway, Suite 300, Costa Mesa, CA 92626 and currently has its principal place of business at 95 Enterprise, Aliso Viejo, CA 92656. SAG transacts or has transacted business in this District and throughout the United States. At times material to this Complaint, acting alone or in concert with others, SAG has marketed, promoted, offered for sale, sold, financed, or extended credit for, the purchase of student debt relief products or services to consumers throughout the United States.

12. Assurance Solution Services, LLC ("ASSL") is a Delaware limited liability company. It has operated out of 3100 Bristol Parkway, Suite 300, Costa Mesa, CA 92626. ASSL transacts or has transacted business in this District and throughout the United States. At times material to this Complaint, acting alone or in concert with others, ASSL has marketed, promoted, offered for sale, sold, financed, or extended credit for, the purchase of student debt relief products or services to consumers throughout the United States.

13. Corporate Debt Relief Defendants SAT, PAG, SAG, and ASSL conducted business under the name "Student Advocates" and each of them used that name when marketing and offering their services to consumers.

*Individual Defendants*

14. Bradley Jason Hunt, also known as Brad Hunt ("Hunt"), is or has served as an owner, Member, and/or President and participated in and managed the day-to-

day business operations of each of the Corporate Debt Relief Defendants.  Hunt formed each entity; set up bank accounts and business relationships; and served as signatory on their bank accounts.  Hunt received consumer complaints against the Corporate Debt Relief Defendants, and was also alerted to consumer complaints that Defendant EAC received from customers to whom EAC had extended credit to pay for the Corporate Debt Relief Defendants' services.  At all times material to this Complaint, acting alone or in concert with others, Hunt formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Debt Relief Defendants, including the acts and practices set forth in this Complaint.  Hunt resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.     Sean Quincy Lucero ("Lucero") is or has served as an owner and Member of the Corporate Debt Relief Defendants.  Lucero formed the Corporate Debt Relief Defendants and served as signatory on their bank accounts.  Lucero provided capital contributions, promissory notes and personal guarantees on behalf of each of the Corporate Debt Relief Defendants and also entered agreements on the their behalf.  He participated in meetings with EAC about the student debt relief industry and high-level discussions about the Corporate Debt Relief Defendants' business.  He was aware of and developed concern about multiple state attorney general inquiries into their business practices, yet proceeded to create and fund several of the Corporate Debt Relief Defendants.  At all times material to this Complaint, acting alone or in concert with others, Lucero had the authority to control, or participated in the acts and practices of the Corporate Debt Relief Defendants, including the acts and practices set forth in this Complaint.  Lucero resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

*Equitable Acceptance Corporation*

16.    Defendant Equitable Acceptance Corporation ("EAC") is a Minnesota corporation whose principal place of business is 1200 Ford Road, Minnetonka, MN, 55305.  EAC transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, EAC, pursuant to an agreement with the Corporate Debt Relief Defendants, extended credit to consumers to pay for the Corporate Debt Relief Defendants' services.  EAC also received and responded to consumer complaints related to its business with the Corporate Debt Relief Defendants, and responded to consumer complaints submitted to the Minnesota branch of the Better Business Bureau and from the Consumer Financial Protection Bureau regarding the Corporate Debt Relief Defendants' deceptive sales tactics.

## **COMMON ENTERPRISE**

17.    The Corporate Debt Relief Defendants have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  The Corporate Debt Relief Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds.  Because the Corporate Debt Relief Defendants have operated as a common enterprise, each of the Corporate Debt Relief Defendants is jointly and severally liable for the acts and practices alleged below.

18.    Individual Defendants Bradley Jason Hunt and Sean Quincy Lucero have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Debt Relief Defendants that constitute the common enterprise.

## COMMERCE

19.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,15 U.S.C. § 44.

## DEFENDANTS DECEPTIVE BUSINESS PRACTICES

### *Overview*

20.     Starting in late 2014, the Debt Relief Defendants operated a nationwide debt relief telemarketing scam preying on thousands of consumers struggling with student loan debt.  Unless otherwise noted, acts and practices described in this Complaint occurred during November 2014 through the present.  References herein to the practices of "Corporate Debt Relief Defendants" refer to the practices of each of the Corporate Debt Relief Defendants.

21.     During telephone calls with consumers, the Corporate Debt Relief Defendants represented that consumers were qualified under a federal program, for which consumers would enroll through the Corporate Debt Relief Defendants, to receive forgiveness of all or part of their student loan balances, or to receive a permanent reduction of the monthly payments that consumers were required to make on their student loans.  In fact, in most instances, consumers were unlikely to qualify for government loan forgiveness programs and/or could not guarantee a permanent reduction in their monthly payments.

22.     During these same calls, the Corporate Debt Relief Defendants also represented that payment amounts they quoted to consumers would go toward paying the consumer's student loan balances, when, in fact, all or part of the quoted amounts would go toward paying the Corporate Debt Relief Defendants' $1,300-1,400 fee.

23.     The Corporate Debt Relief Defendants charged illegal advance fees for their purported debt relief services.

24.     Defendant EAC provided substantial assistance to each of the Corporate Debt Relief Defendants by extending credit in the form of a high-interest loan to

many of the Corporate Debt Relief Defendants' customers to pay for their services. EAC extended credit to customers of the Corporate Debt Relief Defendants who met EAC's criteria for creditworthiness, and EAC collected monthly payments from those customers.

25.     While assisting each of the Corporate Debt Relief Defendants, EAC knew, or consciously avoided knowing, that the Corporate Debt Relief Defendant was making the deceptive representations described in this Complaint.  EAC also knew, or consciously avoided knowing, that each Corporate Debt Relief Defendant was requesting and receiving fees from its credit customers prior to the time that consumers had received the promised debt relief service and had made at least one payment under a new payment plan.

26.     In extending loans to customers of each of the Corporate Debt Relief Defendants, EAC failed to include essential disclosures in the credit contracts that consumers signed, such as the amount financed, the finance charge (the dollar amount that the credit was going to cost the consumer), and the total of payments (the amount that consumers would have to pay in total for the Corporate Debt Relief Defendants' service combined with the price of the credit).

**Background on Student Loan Repayment and Forgiveness Programs**

27.     Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe approximately $1.5 trillion.  The student loan market shows elevated levels of distress relative to other types of consumer debt.

28.     To address this mounting level of distressed debt, the U.S. Department of Education ("ED") and state government agencies administer a limited number of student loan forgiveness and discharge programs.  Most consumers, however, are not eligible for these programs because of strict eligibility requirements.  For example, one program requires the consumer to demonstrate total and permanent disability; another applies to consumers whose school closed while the consumer was still enrolled.  A third program, the Borrower Defense to Repayment ("BDR"), may

provide a loan discharge if the school, through an act or omission, violated state law directly related to the borrower's federal student loan or to the educational services for which the loan was provided.

29.     Other forgiveness programs require working in certain professions for a period of years.  Teacher Loan Forgiveness applies to teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency.  Public Service Loan Forgiveness ("PSLF") applies to employees of governmental units or non-profit organizations who make timely monthly payments for a period of ten years while employed in the public sector.

30.     The federal government also offers potential loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments.  IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income.  To remain in an IDR program, borrowers must recertify their income and family size each year. Obtaining forgiveness through IDR programs requires a minimum of 20 to 25 years of qualifying payments.

31.     Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year.  If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term.

32.     Consumers can apply for BDR, PSLF, IDR, and other loan repayment and forgiveness or discharge programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third-party or the payment of application fees.

33.     ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship.  During forbearance, unpaid interest adds to the principal balance.

34.     ED also allows consumers with multiple federal loans to consolidate them into one "Direct Consolidation Loan" with a fixed interest rate and a single monthly payment.  ED does not charge for consolidation and offers a dedicated helpline and webpage to assist borrowers with the process.

### The Corporate Debt Relief Defendants' Deceptive Representations Regarding Loan Relief and Forgiveness

35.     The Corporate Debt Relief Defendants used lead generators, online advertisements, and social media, among other tools, to gather information about consumers struggling to make their monthly student loan payments.  The advertisements touted the availability of payment relief and loan forgiveness programs available from the federal government.  In some instances, consumers entered their contact information on a landing page to receive further information, after which they received a call from one of the Corporate Debt Relief Defendants. In other instances, consumers simply called the toll-free number available in the advertisement and were then connected to one of the Corporate Debt Relief Defendants.

36.     The telemarketing calls between Corporate Debt Relief Defendants and consumers—which were the primary means by which each of the Corporate Debt Relief Defendants sold its services to consumers—were lengthy, typically lasting 30 minutes to over an hour.  Toward the beginning of each call, the Corporate Debt Relief Defendants told consumers that they could provide the exact amount of the new reduced payment and/or loan forgiveness the consumer was eligible to receive under federal law.

37.     During sales calls, the Corporate Debt Relief Defendants quoted consumers a new reduced monthly student loan payment for which the consumer had

purportedly qualified, which the Corporate Debt Relief Defendants represented was for the term of the loan.  The Corporate Debt Relief Defendants represented that, upon expiration of that term, the consumer's remaining balance would be forgiven. In some instances, the Corporate Debt Relief Defendants quoted consumers specific amounts that they would save, usually in the thousands of dollars, by enrolling in the program.

38.     Representations by the Corporate Debt Relief Defendants that they were able to procure a permanent reduction in consumers' monthly payments, or that consumers had qualified for forgiveness, were false or unsubstantiated because none of ED's IDR programs guarantees consumers a fixed, reduced monthly payment for more than a year or guarantees any forgiveness.  Under ED's IDR programs, monthly payments fluctuate based on a consumer's income in a given year, which the consumer must report annually.  Additionally, whether forgiveness is available at the end of the term, and the amount of any such forgiveness, depends on the total amount that consumers have paid—and the amount that remains unpaid—at the end of the term, which in most instances is 20 to 25 years.  Because the Corporate Debt Relief Defendants could not predict consumers' income over a 20-year period, they did not have an adequate basis for making representations concerning the amount of forgiveness consumers would receive, or the size of the monthly payments that a consumers would be required to make in future years.  In many cases, a consumer's income will rise over the repayment period, and, as the consumer's income rises, so will the monthly payment for the following year.  Any representation of a forgiveness amount based on a consumer's current income is, therefore, likely to be overstated.

### Misrepresentations by the Corporate Debt Relief Defendants Regarding Their Fees

39.     The discussion of fees in the Corporate Debt Relief Defendants' sales pitches was misleading, not only because of direct misrepresentations, but also

because the Corporate Debt Relief Defendants' sales pitches in general obfuscated how much consumers would be paying to whom and for what.

40.   In numerous instances the Corporate Debt Relief Defendants misrepresented that the payment amount they quoted would be going toward consumers' student loans rather than toward paying a fee.

41.   The Corporate Debt Relief Defendants also never advised consumers who signed EAC credit contracts that they would be paying interest on the EAC loan to pay the Corporate Debt Relief Defendants' $1,300–1,400 fee or that the annual percentage rate of that loan was typically between 17% and 22%.  And in some instances the Corporate Debt Relief Defendants led consumers to believe that payment of the $1,300–1,400 fee was required for acceptance into a new loan repayment program.

42.   One of the ways the Corporate Debt Relief Defendants misled consumers was through their use of the terms "program," "entitled," "approval," "enrollment," and "qualify."  The Corporate Debt Relief Defendants used these terms in different ways and at different times to create the impression that they were referring to qualification or approval for, or enrollment in, an ED program, or were referring to the consumer's new student loan payment, when in fact they were referring to qualification for a loan from EAC to pay the Corporate Debt Relief Defendants' fee, or referring to the monthly payment on the EAC loan.

43.   For example, when the Corporate Debt Relief Defendants told consumers the new monthly payment that the consumer was "qualified" for or had been "approved for," they quoted an amount that included both the monthly estimated student loan payment pursuant to an IDR plan and a monthly payment for the Defendants' fee.  However, the Corporate Debt Relief Defendants presented this monthly payment simply as "the payment you qualify for" or as a "total monthly payment."  For customers whose estimated new student loan payment was zero, the amount of "the payment you qualify for" was solely the monthly payment to EAC for

1  the Corporate Debt Relief Defendants' fee, and did not include any payment toward
2  the student loan.

3  **Electronically Signing Defendants' Contracts**

4        44.    During the sales call, consumers were sent an email with links to
5  contracts to sign electronically.  The Corporate Debt Relief Defendants used a script
6  to walk consumers through the electronic signing process.  The scripts prompted the
7  Corporate Debt Relief Defendants' telemarketers to focus consumers on only those
8  portions of the document that the consumer was required to sign electronically.  After
9  consumers applied their electronic signature in a box, the telemarketers would guide
10  them immediately to the next place in the document with a box for the consumer's
11  signature or initials.  Corporate Debt Relief Defendants directed consumers to click
12  the boxes without any suggestion that the consumer read the contract.  In some
13  instances, the Corporate Debt Relief Defendant assured consumers that the
14  documents merely memorialized what the consumer had been told previously during
15  the call.

16        45.    One of the documents consumers were required to sign electronically
17  was the Corporate Debt Relief Defendants' lengthy form contract (the "Debt Relief
18  Agreement").  All of the Corporate Debt Relief Defendants used substantially
19  identical Debt Relief Agreements.  While on the phone with consumers, the
20  Corporate Debt Relief Defendants pressured them to quickly click through and
21  electronically sign or initial multiple pages of the Debt Relief Agreement.  Contrary
22  to assurances by the Corporate Debt Relief Defendants, the Debt Relief Agreement
23  that consumers electronically signed did not in fact accurately reflect the
24  representations that the Corporate Debt Relief Defendants had made or the
25  impressions that they had conveyed to consumers during the sales call.  In many
26  instances, the Debt Relief Agreement contradicted or was inconsistent with direct
27  representations made to consumers during the sales pitch.  For example, according to
28  the Debt Relief Agreement, the service that the Corporate Debt Relief Defendant was

agreeing to provide consisted of "document preparation services to assist consumers who are applying for federal student loan programs using Department of Education (DOE) forms."  The Corporate Debt Relief Defendants never stated or even implied during their lengthy sales pitches touting loan forgiveness and permanent payment relief that they only filled out forms for ED programs.  To the contrary, the Corporate Debt Relief Defendants geared their sales pitches toward convincing often reluctant and financially struggling consumers that they would obtain permanent debt relief from unaffordable monthly loan payments.  The Debt Relief Agreements also imposed an obligation on consumers to pay for the Corporate Debt Relief Defendants' services.

46.     During telemarketing calls with consumers whose credit checks prequalified them for the EAC loan to pay the Corporate Debt Relief Defendants' fee, these consumers also received an email link to electronically sign EAC's credit contract and other materials (referred to collectively herein as the "Credit Plan" documents).  The Corporate Debt Relief Defendants similarly rushed consumers through the electronic signing of the EAC Credit Plan without reviewing the terms in the agreement with consumers, or providing consumers an opportunity to do so themselves.  The EAC Credit Plan documents and disclosures are discussed in more detail below.

**The Corporate Debt Relief Defendants Requested and Received**

**Their Fee in Advance of Performance**

47.     During the relevant time period, the Corporate Debt Relief Defendants collected their fee of over $1,300 from their customers in one of two ways: (1) by way of the loan that EAC extended to the Corporate Debt Relief Defendants' customers; and (2) directly, through what the Corporate Debt Relief Defendants referred to as "cash" or "trust" deals.  Under both payment methods, the Corporate Debt Relief Defendants requested or received payment of their fee in advance of completing their debt relief service.

*Credit Payment Through EAC*

48.     Consumers who met EAC's prequalification criteria for the EAC loan received a Debt Relief Agreement requiring payment but stating that payment of the Corporate Debt Relief Defendants' fee would be made by a third party through a separate "Credit Plan" that the consumer (concurrently) executed with the third party (i.e., EAC).  The consumer would then receive the EAC Credit Plan documents directly from EAC, which stated that the agreement "governs all purchases" that the consumer made from the seller, which was identified as the Corporate Debt Relief Defendant.  The Credit Plan documents also provided that, except for a three-day cancellation right, all sales were final.

49.     Shortly after EAC received consumers' electronically signed Credit Plan documents and approved them for financing, EAC paid the consumer's fee to the Corporate Debt Relief Defendant that had enrolled the consumer.  As EAC described it, EAC paid to the Corporate Debt Relief Defendant "an agreed amount to satisfy the consumer's obligation to [the Debt Relief Defendant]."  EAC paid this amount to the Corporate Debt Relief Defendants before they had completed their debt relief service.

50.     Pursuant to the Credit Plan documents, consumers who were approved for financing by EAC were loaned $1,300 to $1,400 by EAC and were obligated to make monthly installment payments to EAC, which were typically $39 to $49.  The Corporate Debt Relief Defendants, while on sales calls with consumers, obtained consumers' bank, debit, or other payment information, which the Corporate Debt Relief Defendants then provided to EAC.

51.     EAC's general policy and practice was to start billing consumers 45 to 75 days after the consumer signed the Credit Plan documents.  Later, EAC changed its practice and started billing consumers upon hearing from the relevant Corporate Debt Relief Defendant that the consumer's application for a consolidation or repayment plan had been submitted to ED on the consumer's behalf, and that ED had approved the application.  Starting in mid-2016, EAC started requiring some lower-

credit consumers to pay a $150 deposit immediately; EAC began billing these consumers when EAC heard from the relevant Corporate Debt Relief Defendant that ED had approved the consumer's application.  Before sending its first bill to consumers, EAC did not require any documents to verify that the consumer had actually been enrolled in any consolidation or repayment plan.  EAC's policy and practice was not, therefore, to refrain from billing consumers until after they had been approved and had made their first payment under the new repayment program or consolidated loan.  In many instances, EAC sent bills to consumers even when the Corporate Debt Relief Defendant that had contracted with the consumer had not submitted the consumer's application to ED or before ED had approved the consumer's application.  EAC's policy and practice was not, therefore, to wait until after Corporate Debt Relief Defendants fully performed their debt relief services for the customers before sending bills to those customers.

52.     As a general rule, customers of the Corporate Debt Relief Defendants were unable to cancel their obligation to pay for debt relief services following the three day cancellation period, and, therefore, were not able to terminate their contracts at will at any point prior to making their first payment under a new IDR plan.  EAC's policy was not to let consumers out of their payment obligation, advising consumers who wanted to cancel that they were outside of the three-day cancellation period, and often directing these consumers back to the Corporate Debt Relief Defendant who had sold the debt relief services to the consumer.  The Corporate Debt Relief Defendants often advised consumers who wanted to cancel that they owed EAC and that the Corporate Debt Relief Defendant could not cancel that obligation.

53.     Because EAC was paying consumers' fees to the Corporate Debt Relief Defendants who had sold them debt relief services, EAC knew that the Corporate Debt Relief Defendants were receiving their fees prior to completing the debt relief services for consumers.  In light of EAC's billing policy, EAC also knew, or

consciously avoided knowing, that, when it sent its first loan bill to consumers, it was billing consumers for the Corporate Debt Relief Defendants' fees before the consumer had made at least one payment pursuant to a new payment plan from ED and before the Corporate Debt Relief Defendants had fully performed their debt relief services.

*Cash Payment*

54.     Throughout 2016, the Corporate Debt Relief Defendants also took payment by cash, or cash equivalent, up front from consumers who did not enter into a Credit Plan with EAC.

55.     Under this "cash" model, the Corporate Debt Relief Defendants typically imposed upon and charged their customers an initial fee of $495.  The Corporate Debt Relief Defendants required this payment to be made before they started work on customers' applications.  Corporate Debt Relief Defendants then collected the remainder of their fee through monthly payments of $39 to $49.

56.     The Corporate Debt Relief Defendants obtained from these customers their bank, debit or other payment information during the telemarketing call.

57.     The Corporate Debt Relief Defendants claimed that they placed payments they received from these customers into a "trust" or "special purpose" account and waited to take control of those funds until after they submitted the consumer's IDR paperwork to ED.  However, the Corporate Debt Relief Defendants provided these customers with little or no information about the trust account holding the money the customers had paid to the Corporate Debt Relief Defendants.  These customers did not own or have control over or access to the funds that were purportedly being held in these accounts.  Consumers were not entitled to return of those funds, even if they terminated the debt relief service prior to performance of the Corporate Debt Relief Defendants' debt relief services.

**The Relationship between EAC, the Corporate Debt Relief Defendants,**
**and Other Student Loan Relief Dealers**

58.     Defendant EAC holds itself out as an "indirect finance company."  At the beginning of 2015, EAC entered into an arrangement with PAG pursuant to which EAC, on a case-by-case basis, would extend credit to PAG's customers in the amount of PAG's fee (typically $1,314).  Thereafter, EAC entered into a substantially similar agreement with each of the other Corporate Debt Relief Defendants.  The system worked this way: if, during a Corporate Debt Relief Defendant's sales call, a consumer met EAC's prequalification criteria for creditworthiness, the Corporate Debt Relief Defendant would alert EAC, through an electronic system that the parties put in place, that the Corporate Debt Relief Defendant had a prospective credit customer for EAC.  EAC, by way of its electronic document signing vendor, would then send an email to the consumer with a link to the Credit Plan documents.  After EAC received the electronically signed Credit Plan documents back from a customer, it then made an assessment as to whether to extend credit to the Corporate Debt Relief Defendant's customer.  If EAC issued credit to the consumer, EAC would then pay the Corporate Debt Relief Defendant the amount of that customer's fee (minus a discount reflecting the risk of default by the customer) to satisfy the customer's obligation to the Corporate Debt Relief Defendant.  Pursuant to the customer's contract with EAC, the customer would owe the amount of the Corporate Debt Relief Defendant's fee, plus interest, to EAC.

59.     Sometime in 2015, EAC hired Defendant Brad Hunt to locate and investigate other student debt relief companies with which EAC could do business.  Hunt provided training and business materials to these companies regarding sales processes and proper disclosures and received a commission for each consumer that entered into an EAC Credit Plan.

60.     In late 2015, EAC started entering into relationships with other student loan relief dealers, offering the EAC Credit Plan to their customers in the same

fashion as it had been doing business with the Corporate Debt Relief Defendants throughout 2015.[1]  Hunt introduced several dealers to EAC.  By this time, EAC knew or should have known that the sales model that each of the dealers would follow was deceptive.  EAC had already received consumer complaints regarding deceptive sales practices on the part of one or more of the Corporate Debt Relief Defendants.  Despite these complaints, EAC relied on Hunt as the "industry expert" to vet and to train new dealers.  Moreover, EAC failed to conduct an independent review of Hunt's training or the new dealers' sales practices.

## EAC Assistance to the Corporate Debt Relief Defendants' Deceptive Scheme Was Substantial

61.    The assistance that EAC provided to the Corporate Debt Relief Defendants' deceptive telemarketing operations was substantial and allowed the Corporate Debt Relief Defendants to grow over the relevant time period.  The Corporate Debt Relief Defendants viewed the EAC partnership as critical to their business because the EAC-loan model essentially provided them with immediate cash to support operations, without requiring the Corporate Debt Relief Defendants to directly collect fees from their customers.  As an additional benefit to the Corporate Debt Relief Defendants, EAC handled all collections and related issues for payments from consumers who obtained financing from EAC.  In addition, shifting consumers' payment obligations to EAC allowed the Corporate Debt Relief Defendants to deflect consumer complaints and cancellation requests by pointing consumers to EAC to seek resolution.

## EAC Ignored Red Flags

62.    After the start of its business relationship with the Corporate Debt Relief Defendants, EAC received consumer complaints about one or more of these

---

[1] One of these companies was Manhattan Beach Venture, LLC ("MBV").  Plaintiff recently filed a lawsuit in this District against MBV and EAC in which Plaintiff makes allegations that are substantially similar to the allegations in the instant Complaint.  *See FTC v. Manhattan Beach Venture, LLC*, Case No. _____.

commonly owned Corporate Debt Relief Defendants and about other student loan relief dealers with which EAC did business. EAC received complaints directly from consumers, as well as complaints that were forwarded from the Better Business Bureau (BBB) and the Bureau of Consumer Financial Protection. The complaints claimed, among other things, that one or more of the Corporate Debt Relief Defendants or other dealers engaged in misleading sales tactics and that the consumer had not authorized the EAC loan. The BBB had also received numerous complaints about EAC from customers of one or more of the Corporate Debt Relief Defendants. The content and volume of complaints that the BBB received against student loan debt relief companies with which EAC did business became such an issue that, in August 2016, the Minnesota BBB contacted EAC and alerted EAC to the high volume of consumer complaints it had received and the apparently deceptive nature of their sales tactics. Despite these consumer complaints and the BBB's warning, EAC continued to assist the Corporate Debt Relief Defendants by extending financing to new customers of the Corporate Debt Relief Defendants. EAC continued to finance these sales up until the time Hunt and Lucero's company, SAT, stopped making direct sales to consumers in 2017. EAC has continued to collect monthly payments from Corporate Debt Relief Defendants' customers who have many months left on their 36- to 48-month loan terms.

63.    EAC never reviewed or asked to see the sales scripts that any of the Corporate Debt Relief Defendants used. Nor did EAC ever listen to or even ask any of the Corporate Debt Relief Defendants for recordings of their sales calls. Instead, EAC continued to work with the Debt Relief Defendants to expand their businesses.

### Failure of EAC's Credit Contract to Make Essential Disclosures

64.    EAC's Credit Plan documents typically included pages entitled: "Credit Request Authorization"; "Equitable Acceptance Revolving Credit Plan"; "Revolving Credit Plan"; "Purchase Agreement"; "Equitable Acceptance Corporation Privacy Policy"; and "Notice of Cancellation." Over 31,000 customers of the Corporate Debt

Relief Defendants signed EACs Credit Plan documents.  These signed agreements created a credit obligation between the customers and EAC.

65.     TILA requires that creditors clearly and conspicuously disclose a number of significant terms in closed-end credit transactions, such as the amount being financed; the finance charge (the dollar amount that the credit was going to cost the consumer); the number, amounts and timing of payments scheduled to repay the obligation; and the total of payments (the amount that consumers would have to pay for the Corporate Debt Relief Defendants' services combined with the price of the credit).  EAC failed to include these terms in its Credit Plan documents.

### EAC Was the Original Creditor under the Credit Plan Documents

66.     The EAC Credit Plan documents were designed to create the appearance that EAC was an assignee, and that the Corporate Debt Relief Defendant that had made the sale to the consumer was the assignor, of the consumer's credit contract. Under TILA, assignees of credit contracts are generally subject to less liability than original creditors, limited to only those violations apparent on the face of the disclosure statement.  However, EAC was not in fact an assignee of any of the Credit Plan documents.  None of the Corporate Debt Relief Defendants signed or was a party to any of the Credit Plan documents, and, therefore, none of them could assign, and none of them ever did assign, any Credit Plan documents to EAC.

67.     In truth, EAC was the original creditor under each Credit Plan because it regularly extends consumer credit that is subject to a finance charge and is the entity to whom the obligation was initially payable.  It was EAC, through its electronic document signing vendor, that sent the EAC Credit Plan documents to consumers, not the Corporate Debt Relief Defendants; the footer on each page of the Credit Plan documents that consumers received made clear that "The original document is owned by Equitable Acceptance"; and it was EAC, not the Corporate Debt Relief Defendants, that received consumers' electronic signatures on the Credit Plan documents.  EAC admitted that it extended credit to the customers of the Corporate

Debt Relief Defendants, that EAC and these consumers had a direct relationship, and that EAC and these consumers had a separate credit agreement.

**The Credit Plan Documents Created a Closed-End Extension of Credit**

68.     Through use of terms such as "Revolving Credit" and other provisions, the Credit Plan documents were also designed to create the appearance of establishing an open-end extension of credit as that term is defined under TILA.  TILA requires different and less numerically-specific disclosures for the extension of open-end credit in comparison with the requirements for non-closed-end credit transactions, such as loans.

69.     Despite EAC's efforts to create the appearance of an open-end credit transaction in its Credit Plan documents, EAC's credit transactions with the customers of the Corporate Debt Relief Defendants were in fact closed-end credit transactions.  Thus, EAC systematically engaged in "spurious open-end credit transactions" because it facially characterized the credit as open-end, when in fact it was closed-end.

70.     Pursuant to the terms of the Credit Plan, the credit was extended for the purchase of a single product, the Corporate Debt Relief Defendants' debt relief service.

71.     The Credit Plan also required monthly payments of equal amounts.

72.     EAC did not reasonably contemplate repeat transactions under the purported "revolving" Credit Plan.  No customers of any of the Corporate Debt Relief Defendants have ever made any additional purchases using EAC's Credit Plan.  And none of the Corporate Debt Relief Defendants themselves—the only sellers from which consumers were authorized to make purchases under the Credit Plan— contemplated that consumers would make future purchases from them under the Credit Plan.  None of the Corporate Debt Relief Defendants or EAC advertised, marketed, or sold any other goods or services that could be purchased under the Credit Plan.

73.     In its communications with customers, EAC referred to the credit provided under the Credit Plan as "loans."

74.     Also, the amount of credit that was available to the consumers under the Credit Plan did not automatically and unequivocally replenish as consumers paid down their balances.

### Consumers' Efforts to Cancel or Obtain Refunds

75.     A number of customers of the Corporate Debt Relief Defendants have stated that the specific Corporate Debt Relief Defendant from which they purchased the service and/or EAC have responded to their cancellation or refund requests with threats to send their accounts to collections, or to report negative information to the credit bureaus.  In numerous instances, the Corporate Debt Relief Defendants and EAC canceled consumers' obligations only after those consumers filed a complaint with law enforcement or consumer protection agencies.  Other consumers have continued to pay EAC out of concern that negative information will be reported on their accounts to the credit bureaus.

76.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:  Defendants have knowingly engaged in their unlawful acts and practices repeatedly through numerous companies over a period of at least four years.  To the extent any of the Corporate Debt Relief Defendants discontinued their unlawful conduct, they stopped their unlawful conduct only after the FTC and/or various state agencies contacted them and informed them of their investigations.  Defendant SAT remains in the student debt relief business, and maintains the means, ability, and incentive to resume their unlawful conduct.

### **THE FTC ACT**

77.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

78.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## VIOLATIONS OF THE FTC ACT

## COUNT I

### Deceptive Student Loan Debt Relief Representation

### (Against Debt Relief Defendants)

79.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Debt Relief Defendants have represented, directly or indirectly, expressly or by implication, that:

     a.  consumers had qualified for, or were approved to receive, loan forgiveness or other programs that would permanently lower or eliminate their loan payments or balances; and

     b.  consumers' monthly payments to Defendants would be applied toward consumers' student loans.

80.     In truth and in fact, in numerous instances in which Debt Relief Defendants have made the representations set forth in Paragraph 79 of this Complaint, such representations were false or not substantiated at the time Debt Relief Defendants made them.

81.     Therefore, Debt Relief Defendants' representations set forth in Paragraph 79 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

82.     In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

83.     Debt Relief Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd).  A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

84.     Debt Relief Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

85.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

    a.  the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

    b.  the customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and to the extent that debts enrolled in a service are renegotiated, settled,

reduced, or otherwise altered individually, the fee or consideration either:

    i.    bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount.  The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

    ii.    is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  The percentage charged cannot change from one individual debt to another.  The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).  16 C.F.R. § 310.3(b).

86.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

    a.  The total costs to purchase, receive or use, and the quantity of, any good or services that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(i); and

    b.  Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2)(x).

87.     The TSR also prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids

1    knowing" that the seller or telemarketer is engaged in any act or practice that violates

2    § 310.3(a) or § 310.4.

3         88.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c),

4    and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR

5    constitutes an unfair or deceptive act or practice in or affecting commerce, in

6    violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

7         89.    Debt Relief Defendants have engaged in telemarketing by a plan,

8    program, or campaign conducted to induce the purchase of goods or services by use

9    of one or more telephones and which involves more than one interstate telephone call.

10                  **VIOLATIONS OF THE TELEMARKETING SALES RULE**

11                                      **COUNT II**

12              **Advance Fee for Debt Relief Services in Violation of the TSR**

13                         **(Against Debt Relief Defendants)**

14        90.    In numerous instances, in connection with the telemarketing of student

15   loan debt relief services, Debt Relief Defendants have requested or received payment

16   of a fee or other consideration for debt relief services before:

17              a.  the Defendant renegotiated, settled, reduced, or otherwise altered the

18                  terms of at least one debt pursuant to a settlement agreement, debt

19                  management plan, or other such valid contractual agreement executed

20                  by the customer; and

21              b.  the customer had made at least one payment pursuant to that

22                  settlement agreement, debt management plan, or other valid

23                  contractual agreement between the customer and the creditor.

24        91.    Debt Relief Defendants' acts or practices, as described in Paragraph 90

25   of this Complaint, are abusive telemarketing acts or practices that violate Section

26   310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III

### Material Debt Relief Misrepresentations in Violation of the TSR

### (Against Debt Relief Defendants)

92.    In numerous instances, in connection with the telemarketing of student loan debt relief services, the Debt Relief Defendants misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including, but not limited to that:

    a.  consumers had qualified for, or were approved to receive, loan forgiveness or other programs that would permanently lower or eliminate their loan payments or balances; and

    b.  consumers' monthly payments to Defendants would be applied toward consumers' student loans.

93.    The Debt Relief Defendants' acts and practices, as described in Paragraph 92 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## COUNT IV

### Assisting and Facilitating Deceptive and Abusive

### Telemarketing Acts in Violation of the TSR

### (Against EAC)

94.    In numerous instances, EAC provided substantial assistance or support to Debt Relief Defendants whom EAC knew, or consciously avoided knowing, were engaged in violations of the TSR set forth in Counts II-III of this Complaint.

95.    EAC's acts or practices, as described in Paragraph 94 of this Complaint, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(b).

## TILA AND REGULATION Z

96.    The purpose of the Truth in Lending Act is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily

the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

97.    Under TILA, 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. Part 1026, creditors who extend "closed-end credit," as defined in 12 C.F.R. § 1026.2(a)(10), must comply with the applicable disclosure provisions of TILA and Regulation Z, including but not limited to, Sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

98.    "Creditor" means a person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no contract. 12 C.F.R. § 1026.2(a)(17). EAC is a creditor under TILA and Regulation Z because it extends consumer credit subject to a finance charge and the obligation is initially payable to EAC.

99.    "Closed-end credit" means consumer credit other than open-end credit, and "[o]pen-end credit" is defined as "consumer credit extended by a creditor under a plan in which: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. §§ 1026.2(a)(10) and (a)(20). EAC extends closed-end credit (as opposed to open-end credit) to consumers under TILA and Regulation Z because the loans do not meet the requirements for open-end credit.

100.    Sections 121(a) and (b) and 128 of TILA, 15 U.S.C. §§ 1631(a), (b) and 1638(a), and Sections 1026.17(a) and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17(a) and 1026.18, require creditors of closed-end consumer credit

transactions to clearly and conspicuously disclose in writing, among other things, the following about the loan: the identity of the creditor making the disclosures; the amount financed ("using that term and a brief description such as 'the amount of credit provided to you on your behalf'"); the finance charge ("using that term, and a brief description such as 'the dollar amount the credit will cost you'"); the annual percentage rate ("using that term, and a brief description such as 'the cost of your credit as a yearly rate'"); the payment schedule ("the number, amounts and timing of payments scheduled to repay the obligation"); and the total of payments ("using that term, and a descriptive explanation . . . such as 'the total price of your purchase on credit'").  These disclosures must reflect the terms of the legal obligations between the parties. 12 C.F.R. § 1026.17(c).

101.   Pursuant to Section 108(c) of TILA, 15 U.S.C. § 1607(c), every violation of TILA and Regulation Z constitutes a violation of the FTC Act.

## COUNT V

### Violations of TILA and Regulation Z

### (Against EAC)

102.   In the course of extending credit to consumers who purchased services from Debt Relief Defendants, EAC has violated the requirements of TILA and Regulation Z by failing to clearly and conspicuously disclose in writing the following information so that the consumer can make an informed decision regarding the credit being offered:

     a.  the identity of the creditor making the disclosures;

     b.  the amount financed ("using that term and a brief description such as 'the amount of credit provided to you on your behalf'");

     c.  the finance charge ("using that term, and a brief description such as 'the dollar amount the credit will cost you'");

     d.  the annual percentage rate ("using that term, and a brief description such as 'the cost of your credit as a yearly rate'");

    e.  the payment schedule ("the number, amounts and timing of payments scheduled to repay the obligation"); and

    f.  the total of payments ("using that term, and a descriptive explanation . . . such as 'the total price of your purchase on credit'").

103.   Therefore, EAC's practices set forth in Paragraph 102 of this Complaint violate Sections 121 and 128 of TILA, 15 U.S.C. §§ 1631 and 1638, and Sections 1026.17 and 1026.18 of Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

## CONSUMER INJURY

104.   Consumers throughout the United States have suffered and will continue to suffer substantial injury as a result of Debt Relief Defendants' violations of the FTC Act and the TSR, and EAC's violations of the TSR and TILA.  In addition, Debt Relief Defendants and EAC have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Debt Relief Defendants and EAC are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

105.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations  of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

106.   Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Debt Relief Defendants' and EAC's violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

# PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.   Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including a temporary and preliminary injunction, asset freeze, appointment of a receiver, an evidence preservation order, and expedited discovery;

B.   Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, TILA and its implementing Regulation Z by Defendants;

C.   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, TILA and its implementing Regulation Z, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.   Award Plaintiff the cost of bringing this action; and

E.   Award such other and additional relief as the Court may determine to be just and proper.

///
///
///

COMPLAINT

Respectfully submitted,

DATED: September 10, 2019

ALDEN F. ABBOTT
General Counsel

Delilah Vinzon
Maricela Segura
John D. Jacobs

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

- 34 -
COMMPLAINT